**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Penn Square Bank, N.A., Plaintiff-Appellant,**

v.

**Myron J. PALERMO, Defendant-Appellee.**

No. 85–1733.

United States Court of Appeals, Tenth Circuit.

April 3, 1987.

Theodore Q. Eliot of Gable & Gotwals, Tulsa, Okl., for plaintiff-appellant.

Terry W. Tippens and Barbara J. Geyer of Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, Okl., for defendant-appellee.

Before BARRETT, LOGAN, and MOORE, Circuit Judges.

LOGAN, Circuit Judge.

After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed.R. App.P. 34(a); Tenth Cir.R. 34.1.8(c) and 27.-1.2. The cause is therefore ordered submitted without oral argument.

The Federal Deposit Insurance Corporation (FDIC), as receiver of the insolvent Penn Square Bank, sued Myron Palermo for the balance of a promissory note Palermo signed in connection with his purchase of an interest in Oklahoma oil wells through the bank. Admitting the correctness of the note balance, Palermo defended on the ground that he had been fraudulently induced to make the purchase and sign the note. He also counterclaimed, seeking both rescission and damages. The FDIC has appealed from a jury verdict favoring Palermo.

On appeal the FDIC contends that the district court erred in (1) allowing the case to be tried to a jury; (2) denying the FDIC's motions for directed verdict and judgment notwithstanding the verdict; (3) denying the FDIC's motions for mistrial and new trial; (4) instructing or refusing to instruct the jury; (5) allowing Palermo to pursue a fraud claim for both rescission and damages; and (6) allowing Palermo to seek an affirmative recovery against the FDIC despite the Oklahoma statute of limitations.

The only nondocumentary evidence produced at the trial was one witness for the FDIC to prove the existence of and default on the promissory note, and one witness, Palermo, for the defense. Palermo admitted the default on the note. Palermo testified that he was involved in the business of oil and gas exploration and production. In October 1980 he received a call from an acquaintance, Billy Underwood, who told him that Penn Square Bank was arranging the sale of a 1/32 interest in five Oklahoma oil wells with problem loans. A Penn Square loan officer, Clark Long, later phoned Palermo. Palermo testified that Long told him that the wells were "making 150 barrels a day," and that "it looks like a pretty good deal." R. IV, 74. Long told Palermo that the bank could not take less than $130,000 for the interest because

"that's what the man owes the bank for it." *Id.* at 75.

When Palermo and Underwood went to the bank to close the deal, Long there repeated his assurances, telling Palermo that the interest would pay back "about $150,000 in three years," *id.* at 76, and that the operator of the wells, Great Plains Oil and Gas, was a valued customer of the bank and a good operator. Long gave Palermo a detailed reserve report on the wells, with notations added in Long's writing stating "$150,000 in 36 months" and "actual production of 150 Bbl/day." R. II, Ex. 5; R. IV, 76–77. Without further investigation, Palermo and Underwood each signed a note borrowing $65,000 from Penn Square, wrote checks payable to Roy Oliver, the owner, and turned the checks over to Long with the understanding that the bank would give this money to Oliver. Oliver assigned Palermo one-half of the offered interest. Palermo testified at trial that he had relied completely on Long in this transaction and that he had not made any independent investigations.

Production on the wells was lower than Palermo had expected. He testified that in the first three or four months following his purchase, the wells "were probably producing somewhere around 20 or 30 barrels a day." R. IV, 82. Palermo testified that "about two months" after signing the note he was sued by various service companies to whom Great Plains owed money and that it then became apparent to him that the purchased interest would not produce the hoped for $150,000 income over three years. Great Plains later went bankrupt. Palermo testified that he had paid "$25,000 or so" in attorneys' fees to defend suits stemming from Great Plains' difficulties and another $25,000 in operating expenses for the wells. R. IV, 83. By October 1981, Palermo had also paid Penn Square $22,-840.94 on the note. On October 28, 1981, Palermo advised the bank that he would make no further payments.

Palermo did not dispute the FDIC's evidence that $55,358.75 in principal remained unpaid on the promissory note. He did not challenge the reserve report, but maintained that all of Clark Long's representations were fraudulent. In addition to evidence of Great Plains' difficulties and the disappointing production from the wells, there was documentary evidence that the bank had actually loaned only $50,000, not $130,000, to Roy Oliver.

The court submitted the case to a jury. By special verdict the jury found that Palermo "proved his claim of fraud," and "is entitled to recover actual damages in the amount ... of $22,840.94," R. I, 133, the exact amount Palermo had paid on the note.

We consider in Part I the FDIC's contentions of error relating primarily to Palermo's claim that he was defrauded. In Part II we consider the contentions of error relating primarily to the allowable damages.

### I

### A

The FDIC argues that Palermo waived his right to a jury trial by failing to make a timely request, and that the district court should not have allowed a jury to hear this case. Fed.R.Civ.P. 38(b) requires a demand for a jury trial on an issue triable of right by a jury to be made within ten days of the last pleading directed to such issue. Under Fed.R.Civ.P. 38(d), failure to so demand constitutes a waiver of trial by jury, but a trial court retains discretion upon motion under Fed.R.Civ.P. 39(b) to order a jury trial when one was not properly demanded under Rule 38. *See, e.g., Paramount Pictures Corp. v. Thompson Theaters, Inc.,* 621 F.2d 1088, 1090 (10th Cir.1980).

Although Rule 39 provides for the court's discretion to be invoked by motion, "some similar manifestation of the desire of a party to have a jury trial" will suffice. 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2334 at 112 (1971); *see also Swofford v. B & W, Inc.,* 336 F.2d 406, 408–09 (5th Cir.1964) (untimely demand for jury trial under Rule 38(b) has the effect of a motion for jury trial under Rule 39(b)), *cert. denied,* 379 U.S. 962, 85 S.Ct. 653, 13 L.Ed.2d 557 (1965). When the request for

a jury trial is made in a manner sufficient to bring it to the attention of the court and the other parties, as it was here in a pretrial memorandum many months before trial, the failure to file the request as a "motion" should not be deemed fatal. We hold that Palermo made a sufficient request for a jury trial to invoke the trial court's discretion under Rule 39(b).

■ We will reverse the trial court's decision to allow trial to a jury under Rule 39(b) only if it appears from all of the facts and circumstances that the court abused its discretion. *Paramount Pictures,* 621 F.2d at 1090. The FDIC contends the decision here was such an abuse because Palermo's counterclaim was primarily an equitable action for rescission. We have concluded, however, that Palermo could not seek rescission because of his failure to act promptly, but could only claim damages on the contract. See II A, *infra.* An action for damages on the contract is an action at law for which Palermo could have demanded a jury trial of right. 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2311 (1971). We therefore find that the district court acted within its discretion under Rule 39(b).

## B

The FDIC argues that the district court erred in denying its motions for directed verdict and judgment n.o.v. because Palermo failed to prove the necessary elements of fraud.

■ Federal law controls the rights and liabilities of the FDIC in its capacity as receiver of a national bank. 12 U.S.C. § 1819 ("All suits of a civil nature at common law or in equity to which the [FDIC] shall be a party shall be deemed to arise under the laws of the United States...."); *see Argonaut Savings & Loan Assoc. v. FDIC,* 392 F.2d 195, 197 (9th Cir.), *cert. denied,* 393 U.S. 839, 89 S.Ct. 116, 21 L.Ed.2d 110 (1968); 1A J. Moore, *Moore's Federal Practice* ¶ 0.323 [2.–1] (1985). In the absence of a controlling federal statute, the federal courts must devise their own governing principles in conformity with the policies underlying the National Bank Act,

12 U.S.C. § 21 *et seq. See American Surety Co. v. Bethlehem National Bank,* 314 U.S. 314, 316, 62 S.Ct. 226, 227, 86 L.Ed. 241 (1941) (Congress chose to achieve equitable distribution of insolvent banks' assets "through the operation of familiar equitable doctrines evolved by the courts"); *accord FDIC v. Mademoiselle of California,* 379 F.2d 660, 662–63 (9th Cir.1967) (recognizing depositor's right of set-off).

■ In fashioning the federal common law in this area we may look for guidance to the law of the state having the closest connection to the transaction at issue when to do so would not conflict with the need for uniform rules governing bank liquidations. *See D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 474, 62 S.Ct. 676, 687, 86 L.Ed. 956 (1942) (Jackson, J., concurring) ("No doubt many questions as to the liability of parties to commercial paper which comes into the hands of the [FDIC] will best be solved by applying the local law with reference to which the makers and the insured bank presumably contracted."); *American National Bank v. FDIC,* 710 F.2d 1528, 1534 n. 7 (11th Cir.1983) (escrow agreement executed on behalf of FDIC interpreted with reference to Florida law); *FDIC v. Meo,* 505 F.2d 790, 793 n. 4 (9th Cir.1974) (California law applied in determining that purchaser of stock from national bank was not estopped from avoiding his note to the bank for failure of consideration after the bank had gone into receivership). In this case, the oil wells in which Palermo acquired an interest were located in Oklahoma, the promissory note was executed at Penn Square's bank offices in Oklahoma, and the note itself provides that it is "to be construed according to the laws of the State of Oklahoma," R. I, 3. The FDIC became involved in this case only as successor in interest to the bank. Absent strong federal policy to the contrary, the FDIC as receiver takes title to the bank's assets subject to all existing rights and equities. *Peoples-Ticonic National Bank v. Stewart,* 86 F.2d 359, 361 (1st Cir.1936); *In re Anjopa Paper & Board Mfg. Co.,* 269 F.Supp. 241, 253 (S.D.N.Y.1967). We are aware of no federal policy or need for

uniformity that would be frustrated by incorporating the law of Oklahoma as the federal rule of decision in this case. *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 727–29, 99 S.Ct. 1448, 1457–59, 59 L.Ed.2d 711 (1979).

■ Under Oklahoma law the elements of fraud are:

  (1) a material, false representation;

  (2) made with knowledge of falsity, or recklessly without any knowledge of its truth, and made as a positive assertion;

  (3) with intention that it be acted upon by the other party;

  (4) actual reliance by the other party; and

  (5) resulting injury.

*D & H Co. v. Shultz,* 579 P.2d 821, 824 (Okla.1978); *State v. Brown,* 519 P.2d 491, 495 (Okla.1974). The same elements are required to establish fraud as a defense to a suit on a promissory note. *Johnson v. Eagle,* 355 P.2d 868, 870 (Okla.1960).

Oklahoma imposes a high standard of proof on the party alleging fraud. Fraud is never presumed; the evidence must be "clear, strong and convincing and such as to rebut every presumption of honesty and fair dealing." *Jewell v. Allen,* 188 Okla. 374, 376, 109 P.2d 235, 237 (1940); *see also Tice v. Tice,* 672 P.2d 1168, 1171 (Okla. 1983); *Barnett v. Life Insurance Co. of the Southwest,* 562 F.2d 15, 19 (10th Cir. 1977) (citing Oklahoma law that a fraud case should not go to the jury "unless facts are produced from which an irresistible deduction of fraud reasonably arises").

■ In this circuit, the sufficiency of the evidence to go to the jury is a matter of federal law even in diversity cases. *Hidalgo Properties, Inc. v. Wachovia Mortgage Co.,* 617 F.2d 196, 198 (10th Cir.1980); *Oldenburg v. Clark,* 489 F.2d 839, 841 (10th Cir.1974). *See generally* 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2525 (1971) (noting conflict among circuits). The standard is that the trial judge may grant a motion for directed verdict only when all the inferences to be drawn from the evidence are so in favor of the

moving party that reasonable persons could not differ in their conclusions. *Hidalgo Properties,* 617 F.2d at 198; *Taylor v. National Trailer Convoy, Inc.,* 433 F.2d 569, 571–72 (10th Cir.1970). The same standard applies in reviewing the trial court's decision to grant or deny a motion for directed verdict or judgment n.o.v. *Motive Parts Warehouse v. Facet Enterprises,* 774 F.2d 380, 385–86 (10th Cir.1985); *Barnett,* 562 F.2d at 17. When, as here, the substantive law requires that the nonmoving party's case be sustained by clear and convincing evidence, this standard also must inform the court's decision whether to grant a motion for directed verdict. *See Mackey v. Burke,* 751 F.2d 322, 327–29 (10th Cir.1984) (Kansas law applied; evidence insufficient under clear and convincing standard to warrant submitting fraud issue to jury); *Barnett,* 562 F.2d at 19 (Oklahoma law applied; evidence insufficient to warrant submitting fraud issue to jury). We must therefore examine the evidence introduced at trial to determine whether a reasonable jury could conclude that fraud had been proved by clear and convincing evidence.

Palermo alleges that his signature on the promissory note was procured by the following misrepresentations: (1) that the five oil wells were actually producing 150 barrels per day; (2) that a $\frac{1}{32}$ interest in the wells would pay back $150,000 in three years; (3) that Great Plains was a good operator and a valued customer of the bank; and (4) that the previous owner of the $\frac{1}{32}$ interest was in default on a $130,000 loan from Penn Square secured by the property.

There is some evidence tending to show that all of these representations were false. Except for the fourth misrepresentation, however, Palermo produced no evidence to establish that the misrepresentations were made knowingly or recklessly. There is no indication that Clark Long had access to any information other than the reserve report on which to base his statements regarding production and income from the wells. Palermo admitted that the report confirmed Long's prediction that the wells

would produce $150,000 in three years. The "Gross Oil Production" figures in the report appear consistent with production in excess of 150 barrels per day. In the absence of any showing of collusion between Long and the engineer who prepared the report, there is nothing from which the jury could infer the requisite knowledge or recklessness on Long's part with regard to the first or second misrepresentation about the wells' productivity.

Evidence of scienter is similarly lacking with respect to Long's misrepresentations about Great Plains. Palermo presented no evidence that Great Plains was not a good customer of the bank as of October 1980. Nor was there any evidence that Long knew or should have known anything negative about Great Plains' operations at that time, or that Long spoke without a reasonable basis for believing that Great Plains was a good operator.

■ There is evidence, however, tending to show that Long's misrepresentations regarding the outstanding indebtedness on the property were made with knowledge of their falsity. Various bank records were admitted which indicate that the bank loaned Roy Oliver $50,000 on October 10, 1980, secured by "5 wells in Noble Co., OK," R. III, Ex. 3, and that Oliver repaid this loan on October 22, 1980, the same day he deposited the $130,000 received from Palermo and Underwood. The FDIC did not attempt to rebut the natural inference arising from this evidence that Long had knowingly misrepresented the amount of the loan.

Palermo testified that the amount the bank was willing to loan on the property was important to him in determining the value of the wells and that he would not have bought the property had he known that Oliver only owed $50,000 on it. Esti-mates of value are generally regarded as insufficient to support justifiable reliance, especially when the property involved "depends for its value upon contingencies which may never occur." *Myers v. Chamness*, 114 Okla. 220, 221, 245 P. 879, 880 (1926) (quoting *Gordon v. Butler*, 105 U.S. (15 Otto) 553, 26 L.Ed. 1166 (1882)); *accord Bradley v. Little*, 192 Okla. 121, 122, 134 P.2d 126, 127 (1943).[1] Had Long merely represented that he considered the property to be worth $130,000, Palermo's acceptance of this opinion would have been at his own risk. But Palermo testified that Long represented that Oliver actually owed $130,000 on the property. This was a misrepresentation of fact, not an opinion.

In analogous circumstances, courts have held that a buyer of property may maintain an action for fraud against a seller who misrepresents the price he himself has paid for the property. *See, e.g., Withroder v. Elmore*, 187 P. 863, 864 (Kan.1920); *Wisconsin Steel Treating & Blasting Co. v. Donlin*, 23 Wis.2d 379, 383, 127 N.W.2d 5, 8 (1964); Annot., 66 A.L.R. 188, 193 (1930) (citing cases). The courts are particularly inclined to allow recovery when the price to the buyer is explicitly based on the seller's cost. *See Rimling v. Scherper*, 206 Wis. 532, 543, 240 N.W. 159, 164 (1932) (representation that property is being sold at cost is "a strong and persuasive inducement to buy"); *Beare v. Wright*, 103 N.W. 632, 636–37 (N.D.1905) (misrepresentation regarding price paid by vendor not actionable unless parties agree that price to vendee will be based on price paid by vendor); *Bryant v. Stohn*, 260 S.W.2d 77, 82–83 (Tex.Civ.App.1953).

There is Oklahoma authority that might be construed to the contrary. In *Steiner v. Hughes*, 172 Okla. 268, 44 P.2d 857 (1935), the court denied relief to a stock purchaser

---

1. Palermo was aware that the properties he was purchasing were highly speculative. He admitted having read the first page of the reserve report which states:

"The accuracy of this estimate of reserves is soley [sic] a function of interpretation and judgment. Such findings should be accepted with the understanding that future production and other events could well justify the revi-sion of these reserve estimates. This is especially true with the formation under evaluation and therefore, it is my recommendation to have properties of this nature re-evaluated at annual intervals.

All data utilized in the forecast was furnished by the working interest owner or the operator and assumed to be accurate and correct."
R. II, Ex. 5.

who claimed he had been defrauded by the seller's misrepresentation concerning his profit per share. The court said:

> "[W]e have found no case, by this court, in which the contended fraud consisted merely of a statement made by the seller, upon inquiry by the purchaser, that the property was costing, or had cost him, the seller, more than it actually cost, where this court has held that such a statement, *unless coupled with other elements of fraud,* inequality of the parties, overreaching or confidential relations, has been held to constitute actionable misrepresentation."

*Id.* at 270, 44 P.2d at 860 (emphasis added). Close examination of the opinion, however, leads us to believe that the result in *Steiner* turned on the absence of actual reliance, a necessary element of fraud in Oklahoma. The contract in *Steiner* was for the purchase of thirty shares of the Public Service Company of Oklahoma. The purchaser-defendant had previously dealt in stocks of this company and had, on the day of this purchase, obtained market quotations on the shares from other dealers. He apparently did not even allege that he had been misled as to the value of the shares on the day in question. Under the circumstances, the court did not believe the defendant's claim that the seller's profit margin was a material factor inducing his purchase. *See id.* at 860.

We note in more recent Oklahoma decisions, statements that ordinarily might be regarded as opinions or estimates of value have been treated as material when the circumstances indicate reasonable reliance. *See Varn v. Maloney,* 516 P.2d 1328, 1332 (Okla.1973) (statement made to investors in oil and gas property, about merits and minimal risk of proposed technical method of operation, held actionable in view of promoter's superior knowledge); *Johnson,* 355 P.2d at 871 (seller's representation that lessee of hotel was a "competent manager" was misrepresentation of fact within his peculiar knowledge, not mere opinion); *Beavers v. Lamplighters Realty, Inc.,* 556 P.2d 1328, 1331 (Okla.Ct.App.1976) (statement by seller that third person had offered to pay a certain sum for property is

"statement of material fact affecting the value and may form the basis for an action of deceit.")

We do not believe that the Oklahoma Supreme Court would deny relief to Palermo as a matter of law for Long's misrepresentation about the loan value. The value of a $\frac{1}{32}$ interest in five oil and gas wells is not as readily ascertainable as the market price of a publicly-traded stock. It was reasonable for Palermo to have placed considerable weight on the willingness of a national bank to accept the property as security for a $130,000 loan, as he testified he did. We conclude that the evidence concerning Long's misrepresentation about the loan value of the property was sufficiently clear and convincing to submit the issue to the jury. We therefore agree that the district court properly denied the FDIC's motions for directed verdict and judgment n.o.v.

### C

■■■ The FDIC argues that the district court erred in refusing to declare a mistrial following Palermo's remark that Long was "under investigation by the FBI," R. IV, 92, and in denying the FDIC's motion following the verdict for a new trial on the same grounds. The district court found, however, that "the trial as a whole did not apppear to be subverted nor the parties prejudiced by the forbidden testimony." R. I, 207. The court noted that the statement had been made only once, and that it concerned a person who was neither a party nor a witness. *Cf. Rodgers v. Hyatt,* 697 F.2d 899, 901–03 (10th Cir.1983) (repeated inadmissible prejudicial statements concerning alleged FBI investigations of plaintiffs; grant of motion for new trial affirmed); *Brown v. Royalty,* 535 F.2d 1024, 1028 (8th Cir.1976) (repeated inadmissible prejudicial statements concerning police failure to issue defendant traffic ticket and plaintiff's holding of insurance; denial of motion for new trial reversed). The court had admonished the jury to disregard the improper comment.

We reverse a ruling on a motion for mistrial or new trial only for clear abuse of discretion. *See Rodgers*, 697 F.2d at 902. We find no clear abuse here.

D

The FDIC argues that the district court erred in refusing to instruct the jury on the issue of waiver. A party is only entitled to instructions on those theories of his or her case that are supported by competent evidence. *Brownlow v. Aman*, 740 F.2d 1476, 1489 (10th Cir.1984). Here, the FDIC stresses that Palermo had at least some knowledge of the alleged fraud within two months of signing the note—but that he nevertheless continued making loan payments for another year. The FDIC contends this is competent evidence to show a "waiver" by Palermo, and thus it should have been allowed an instruction on waiver. We do not agree.

■ The FDIC's proposed instruction confused waiver with estoppel. Waiver is the intentional relinquishment, by express words or unequivocal action, of a known right. *See, e.g., Midwest Maintenance & Construction Co. v. Vela*, 621 F.2d 1046, 1048 (10th Cir.1980); *J.H. Cohn & Co. v. American Appraisal Associates, Inc.*, 628 F.2d 994, 1000 (7th Cir.1980); *Faulkenberry v. Kansas City Southern Railway Co.*, 602 P.2d 203, 206–07 (Okla.1979). It is not possible to say that Palermo's loan payments, by themselves, unequivocally expressed an intention to waive any later counterclaim for fraud in a suit on the note. In fact, Palermo's October 28, 1981, letter to Clark Long is clear evidence to the contrary. The FDIC did not argue that intent had been established. Rather, it requested an instruction stating that "waiver" is established if the jury finds both of the following:

> "(a) after the defendant, Palermo, began the course of action contemplated by the parties to the transaction, but before that course of action was completed, the defendant, Palermo, learned what the actual facts were; and
>
> (b) nonetheless, with full knowledge of the actual facts, defendant, Palermo,

thereafter continued the course of action contemplated by the transaction, when a reasonably careful person under the same or similar circumstances would not have do [sic] so."

R. I, 79. This instruction comes closer to stating, if anything, the rule on equitable estoppel, than the rule on waiver.

■ Although some cases have used the terms waiver and estoppel interchangeably, *see, e.g., Hidalgo Properties*, 617 F.2d at 199; *Steiger v. Commerce Acceptance of Oklahoma City, Inc.*, 455 P.2d 81, 89 (Okla.1969), the concepts are best kept distinct. *See J.H. Cohn & Co.*, 628 F.2d at 1000. One can be "estopped" from asserting a right who has acted in such a way that another party is reasonably led to believe that the right will not be asserted. *See, e.g., Che-Li Shen v. INS*, 749 F.2d 1469, 1473 (10th Cir.1984); *Burdick v. Independent School District No. 52*, 702 P.2d 48, 55 (Okla.1985). Beyond waiver, however, estoppel additionally requires that the party asserting it reasonably and detrimentally rely on the estopped party's conduct. *Che-Li Shen*, 749 F.2d at 1473; *Burdick*, 702 P.2d at 55. The FDIC's requested instruction failed to include the essential reliance element of estoppel. Even had reliance been included in the proposed insruction, there was no competent evidence to support the request. The evidence shows no reasonable and detrimental reliance by the FDIC's predecessor, Penn Square, on anything that might be represented by Palermo's loan payments. The trial court thus did not err in refusing the instruction.

II

A

■ The FDIC argues that the district court erred in allowing Palermo to seek both rescission and damages for his fraud claim. We need not decide whether these remedies are mutually exclusive, as the FDIC maintains, because we find that Palermo's failure to comply with the Oklahoma statute governing rescission, Okla.

Stat.Ann. tit. 15, § 235, prevents him from seeking that remedy.

Under § 235, the party attempting rescission must act "promptly, upon discovering the facts which entitle him to rescind" and must offer to return everything of value which he has received under the contract. The prompt action requirement is strictly enforced. *Harmon v. Phillips Petroleum Co.*, 196 Okla. 607, 610–11, 167 P.2d 360, 364–65 (1946) (five-month delay barred rescission); *Creach v. Home Owners' Loan Corp.*, 191 Okla. 484, 485, 131 P.2d 108, 110 (1942) (sixteen-month delay barred rescission); *see also Appliance Distributors, Inc. v. Mercury Electric Corp.*, 202 F.2d 651, 654 (10th Cir.1953).

In this case, Palermo admits that he became aware of the alleged fraud in October 1981. Although he informed the bank at that time that he did not intend to pay off the loan, he did not demand a refund of the payments he had already made, and did not tender back the property. In fact, he continued to receive monthly income from the property. His first attempt to rescind appears in the answer and counter-complaint he filed in March 1984, after the FDIC sued him to collect the balance on the note. This is simply too late.

**B**

Having failed to satisfy the Okla.Stat. Ann. tit. 15, § 235 requirements for rescission, Palermo is limited to affirming the contract and counterclaiming for damages. The counter-complaint he filed here sufficiently alleges a claim for damages based on the bank's fraud.

■ But we agree with the FDIC that the statute of limitations bars Palermo from seeking affirmative relief. As noted above, this action for fraud arises under federal law because the FDIC has brought the action as receiver for Penn Square. 12 U.S.C. § 1819. When no federal statute of limitations expressly applies to an action arising under federal law, federal courts generally apply the most closely analogous state statute of limitations in the absence of countervailing federal policy. *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 158–63, 103 S.Ct. 2281, 2287–89, 76 L.Ed.2d 476 (1983); *Wilson v. Garcia*, 471 U.S. 261, 266–67, 105 S.Ct. 1938, 1942, 85 L.Ed.2d 254 (1985).

■ Under Okla.Stat.Ann. tit. 12, § 95 (Supp.1985), an action for fraud must be commenced within two years of the discovery of the fraud.[2] At trial, Palermo admitted that at least by October 1981 he was aware that the wells were not producing 150 barrels per day, that Great Plains was not a good operator, and that his income from the property would not approach $150,000 in three years. Palermo's October 28, 1981, letter to Clark Long states that "the properties you sold me were completely misrepresented by you as a loan officer of the Penn Square Bank." R. III, Ex. 2. Although Palermo apparently did not learn until after this action had been commenced that the outstanding indebtedness on the property had been misrepresented, this fact could only have served to confirm Palermo's belief that he had been misled; it did not constitute "discovery of the fraud" for purposes of the statute of limitations. The limitations period therefore expired no later than October 28, 1983.

■ Under the Oklahoma pleading code in effect at the time this action was commenced, the filing of a complaint operates as a waiver of the statute of limitations defense with regard to any set-off or counterclaim in the nature of a recoupment that arises out of the same transaction as the original complaint. Okla.Stat.Ann. tit. 12, § 273 (1960); *Mid-State Homes, Inc. v. Johnston*, 547 P.2d 1302, 1306 (Okla.1976). The statute of limitations continues in effect, however, with respect to any claim for affirmative relief:

---

**2.** Palermo's argument that the five-year contract limitations period should apply is without merit. Under the instant case, the cases Palermo cites involve failure of consideration in addition to fraud as grounds for cancellation of deeds. *See Baker v. Massey*, 569 P.2d 987, 991 (Okla. 1977); *Crumley v. Smith*, 397 P.2d 119, 124 (Okla.1964).

"It is well settled in Oklahoma that while the statute of limitations will not bar a fraud from being asserted as a defense to the enforcement of a transaction asserted as fraudulent, the statute will run and bar affirmative relief sought on the ground of fraud when the cause of action accrued more than two years previously."

*Johnson*, 547 P.2d at 1306. Fed.R.Civ.P. 13(a), governing compulsory counterclaims, reflects no federal policy on this issue; we therefore regard Oklahoma law as controlling. *See* 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1419 at 109 (1971); *cf. Hartford v. Gibbons & Reed Co.*, 617 F.2d 567, 570–71 (10th Cir.1980) (applying similar New Mexico rule in diversity case).

■■ The new Oklahoma Pleading Code, Okla.Stat.Ann. tit. 12, §§ 2001–2027, effective November 1, 1984, repealed § 273 discussed above and changed the rule with respect to affirmative relief. Section 2013C of the new pleading code provides:

"Where a counterclaim and the claim of the opposing party arise out of the same transaction or occurrence, the counterclaim shall not be barred by a statute of limitation notwithstanding that it was barred at the time the petition was filed, and the counterclaimant shall not be precluded from recovering an affirmative judgment."

This section did not become effective until nearly nine months after the FDIC filed its complaint. Palermo's brief quotes Rule 1 for the District Courts of Oklahoma (effective November 1, 1984) as providing that the new pleading code "governs all proceedings in actions pending on the day that it takes effect." We note, however, that Rule 1 also provides that the new code is not to be applied when "its application in a particular action would not be feasible or would work injustice, in which event the former procedure applies." West's Oklahoma Court Rules and Procedure 527 (1987). Applying § 2013C would work injustice, in our view, if it were allowed to revive a right to damages in a case commenced nine months before that section's effective date, simply because the suit had not yet terminated. We therefore conclude that Palermo could assert his fraud claim only as a set-off or counterclaim in the nature of a recoupment, to reduce or eliminate his liability on the promissory note, not as a claim for affirmative relief.

## C

■■ The court's instructions to the jury were improper because they allowed the jury to effect rescission. The jury was instructed that the FDIC was entitled to recover on the note "unless the defendant proves fraud," R. IV, 195. During trial, the jury was repeatedly told that Palermo was seeking to rescind and would tender back the property and the revenues he had received. The court's instructions permitted the jury to effect a rescission by restoring Palermo to the position he had occupied before purchasing the property. Rescission and restitution in fact appears to be the most likely theory for the jury's award, since that award equaled to the penny the total amount Palermo had paid on the note. This measure of damages cannot be had upon affirmance of a contract and claim for damages, the only cause of action available to Palermo. *See Holcomb & Hoke Mfg.*, 102 Okla. 175 at 178, 228 P. 968 at 971.

■■ The jury's instructions were improper on the fraud counterclaim because they stated "if you find that the defendant has proved his claim of fraud, you may award him actual damages to compensate him for the fraud." R. IV, 199. The court did not instruct the jury that the damages were limited to the amount of the defendant's liability on the note and that they were required to offset the defendant's damages against this liability.

■■ The court's instruction on computing damages was also erroneous. The jury was told that it could compute the defendant's damages "by considering defendant's expenses incurred in operating the property and defending against claims based on his ownership and deducting therefrom any sums he received as revenues on his invest-

ment." R. IV, 199. The appropriate measure of damages in a case of this kind, however, is the difference between the value of the property as represented and its actual value on the date of purchase. *A.A. Murphy, Inc. v. Banfield,* 363 P.2d 942, 946 (Okla.1961); *accord Holcomb & Hoke Mfg. Co. v. Jones,* 102 Okla. 175, 178, 228 P. 968, 971 (1924).[3] Consequential damages are recoverable, but only if they were proximately caused by the fraudulent conduct. *See Barnes v. McKinney,* 589 P.2d 698, 701–02 (Okla.Ct.App.1978).

### III

In sum, on Palermo's fraud claim, we conclude that the trial court correctly permitted the case to be tried to a jury, properly rejected the FDIC's motions for directed verdict and judgment n.o.v. and for mistrial and new trial based on prejudicial testimony, and rightly refused to instruct the jury on the FDIC's theory of waiver. The FDIC presented no substantial evidence to impeach Palermo's testimony on fraud, which the jury evidently believed. We see no reason to retry that issue, despite the errors relating to the damages portion of the trial. We therefore affirm the jury verdict for Palermo on his claim of fraud.

We also conclude that Palermo was not entitled to pursue his fraud claim as one for rescission under Oklahoma law, but only as a claim for damages, and only as a set-off or counterclaim in the nature of a recoupment, not as a claim for affirmative relief. The instructions to the jury on damages were sufficiently erroneous to require a new trial on the issue of damages. We therefore set aside the award of damages based on those instructions and remand for a proper determination of damages in light of the principles expressed herein.

AFFIRMED in part, REVERSED in part, and remanded for further proceedings consistent herewith.

3. Here, the only misrepresentation which the jury could have found to be fraudulent related directly to the price at which the property could be sold. In these circumstances, the value of

the property as represented is equal to the price paid for the property. *See Beavers,* 556 P.2d at 1333.